# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

|  |  |  |
|---|---|---|
| MARK E. GESSNER, | : |  |
| Plaintiff, | : | Case No. 3:11cv00286 |
| vs. | : | District Judge Thomas M. Rose |
|  |  | Chief Magistrate Judge Sharon L. Ovington |
| JOHN S. HOWARD, *et al.*, | : |  |
| Defendants. | : |  |

## REPORT AND RECOMMENDATIONS[1]

### I.    Introduction

Dayton Police Officers arrested and jailed Plaintiff Mark E. Gessner, a resident of

Dayton, Ohio, on August 12, 2009 around 10:25 p.m.  He was later charged by criminal

complaint with four misdemeanors:  failure to disclose personal information, obstructing

official business, resisting arrest, and public intoxication.  (Doc. #45, PageID at 1788).  At

the conclusion of his jury trial in September 2010, he was acquitted of all charges.

Gessner brings the present case *pro se* under 42 U.S.C. §1983.  Defendants are the

Dayton Police Officers involved in his initial stop and his arrest, other Dayton Police

Officers also present at the time, and the City of Dayton.  Gessner claims that the Defendant

Police Officers (1) arrested him without a warrant and without probable cause in violation of

---

[1]  Attached hereto is a NOTICE to the parties regarding objections to this Report and Recommendations.

his rights under the Fourth and Fourteenth Amendments to the U.S. Constitution; (2) used

excessive and unnecessary force to effect his arrest in violation of the Fourth Amendment to

the Constitution; and (3) committed the torts of false arrest and intentional infliction of

emotional distress under Ohio law and violated his rights under the Ohio Constitution.

Gessner seeks a jury trial on his claims, $200,000.00 in compensatory damages, and an

amount of punitive damages to be determined at trial.

The case is presently before the Court upon Defendants' Motion for Summary

Judgment (Doc. #25), Gessner's Memorandum in Opposition and Notice to Correct Record

(Doc. #s 34, 46), Defendants' Reply (Doc. #47), and the record as a whole.

Defendants' Motion for Summary Judgment does not seek summary judgment in

favor of one Defendant:  Police Officer Thomas Cope.

## II.    **Factual Background**

### A.    **Gessner's Deposition**

Gessner testified during his deposition about the events before and during his arrest.

During the day of his arrest, he was busy repairing fences in the backyard of his home

on Wyoming Street in Dayton.  He worked diligently, not stopping until 8:00 p.m.  He went

inside his home where his long-time girlfriend, Marla Rhodes, was watching television.

Rhodes went to bed around 9:30 p.m.  Around 10:10 p.m. Gessner left home to get

something to eat at a nearby fast-food restaurant.  By this time it was dark outside.

Gessner got into his truck and noticed a police cruiser in his rearview mirror.  At first,

the police cruiser sat there.  About 30 seconds later, the police cruiser pulled alongside

2

Gessner's truck and a spotlight shined on him.  Gessner put his hands up and looked at the officer so the officer could see his face and hands.  After 10 seconds the officer drove away.

The incident caused Gessner to wonder what was going on in the area that led the officer to approach and shine a spotlight on him.  He got out of his truck and began walking. He soon noticed bright lights shining into a nearby cemetery.  The lights came from police cruisers on Cross Street, which runs perpendicular to Wyoming Street.  Gessner did not know what was going on but he did not "want to be close to the cruisers and their activity down there...." (Doc. #26, PageID at 267).  He returned to his house, entered through the front door, and walked through the house.  Exiting his house through the backdoor, he saw two police cruisers nearby on Cross Street, so he went back inside.

Gessner did not heed his initial instinct to stay away from the police.  He walked back through his house, exited through the front door, and began walking down the sidewalk towards the intersection of Wyoming and Cross Streets.  Reaching the intersection, he turned 90 degrees and saw a "patrolman on foot and three cruisers, they were in a circular formation." *Id*., PageID at 273.  Gessner was standing about 210 feet from the patrolman.

One officer began to walk towards Gessner.  One police cruiser also began to roll slowly toward him, matching the speed of the walking officer.  Gessner explains his reaction: "I thought what the heck is going on here.  First they spotlight me, and then they're traveling around, I didn't know what they were going to do.  I don't know who they were coming towards.  I wanted to get out of there." (Doc. #26, PageID at 275).  Gessner was

3

also concerned because a police officer in 2001 had "beat him down" in the same spot.[2]  He

considers "that spot to be a doggone black hole."  *Id*.  He did not concentrate on this but it

flashed through his mind.  He decided to get out of there.  *Id*., PageID at 277.

Gessner began walking "fairly quickly" towards his house.  As he did this, he

thought, "I'm going to turn around slowly and I'm going to step away slowly so that I don't

look like ... I'm going to haul ass out of there....  I – I just turned around casually."  (Doc.

#26, PageID at 277).  He did not want to give the officers a reason to stop him.  Gessner

described his pace as he walked towards his house:  "I just motored on down.  Speed – I

kind of like speed walked..., I was going pretty quick.  I didn't want anything to do with

them."  *Id*., PageId at 279.  "I walked right up through the grass and hit my sidewalk..., two

steps up, onto my porch, walked – opened my storm door and went to insert my key in the

dead bolt cylinder, and I was stopped by the Dayton police officer...."  *Id*., PageID at 280.

At the time of the incident, Gessner did not know the officers or their names.  He also

did not know that they were following him until Officer John S. Howard told him to get

away from the door.  When Officer Howard again told him to get away from the door,

Gessner responded, "why should I, this is my door, this is my home, I live here and I want to

go inside."  (Doc. #26, PageID at 284).  According to Gessner, the officer said, "How do we

know it's your home[?]"  *Id*.  Gessner told the officer that he was holding the key to the

front door in his hand and that he had his driver's license in his pocket with the same address

---

[2]  Gessner is referring to an incident in 2001 that was the subject of a civil lawsuit he filed in state
court.  *Gessner v. Schroeder*, Ohio App. No. 05cv534 (Feb. 9, 2007) (Doc. #34, Attachment 3).

as the house. Gessner also asked Officer Howard if he could knock on the door to wake up

his sleeping wife who could confirm that he lived there.[3] According to Gessner, Officer

Howard said, "no, you're not going to do that, you're not going to come near this door."

(Doc. #26, PageID at 286).

Close to the moment when Officer Howard arrived at Gessner's front porch, the other

Dayton Police Officers also arrived. Officer Theodore Trupp moved to a position between

Gessner and his front door. Officer Trupp took Gessner's arm and started to pull him away.

Gessner testified:

> I thought, holy smokes, they're going to pull me away from my home.
>
> So what I did is I pounded on my door casing. I couldn't get – I couldn't
> pound on the door anymore because he pulled me away.
>
> So there's a casing, my door has got a storm door, and I couldn't knock on my
> door directly. There's – there's a door casing that goes around.
>
> And so as he pulled me away, I knew that I wasn't going to be able to wake
> Marla up if I didn't start banging pretty quickly. So what I did is I banged on
> the casing with my right fist, and then Trupp – Trupp pulled me away....

(Doc. #26, PageID at 288). Before Gessner stepped off the porch, he took out his wallet and

pointed to the address on his driver's license. He did not hand his wallet to Officer Howard.

He explained during his deposition, "I just opened it up, because when you look at my

wallet, you can see my driver's license ...." *Id*., PageID at 292. Gessner testified you can

see his address on his license "plain as day." *Id*. According to Gessner, Officer Howard

---

[3] Gessner was referring to his girlfriend Marla Rhodes, who was asleep in the house.

"had no interest in looking at it.... So when he did – when he saw the key in my hand and he didn't want to look at my wallet, I knew there was something fishy going on." *Id.*, PageID at 293.

Gessner testified that he had no idea why the officers were there. He asked why he was not allowed to wake up his wife, and Officer Thomas Cope told him that they were not going to let him near the front door. Gessner testified that **Officer Cope** "was the guy with **short reddish hair**. That's what I knew about him." *Id.*, PageID at 295 (emphasis added).

Gessner asked Officer Cope why he was there, who sent him. Officer Cope answered, "Obama." *Id.*, PageID at 294. Officer Howard also told Gessner "Obama sent me." *Id.*, PageID at 298. Gessner responded, "are you saying that President Obama declared a police state, martial law?" *Id.*

Officer Cope then "said you're going to have to come out here and answer some questions, and if you don't, you're going to be arrested." (Doc. #26, PageID at 298). Gessner responded, "I've already answered all your questions...." *Id.*, PageID at 299. Gessner then testified, "I said, you know, I was – what I was thinking about saying, I was thinking, why do I have to go out to the sidewalk and answer questions, why doesn't he just ask me right here, is what I was thinking ... just ask me, ask me. So the only question that they asked me was one – one question, how do we know it's your door." *Id.*

By this time, Gessner believed that the Officers were "up to no good...." *Id.*, PageID at 301. He explained, "I didn't want to go out on that sidewalk and get my ass beat.... I didn't want to go to the sidewalk, I wanted to stay right there and go in my home." *Id.*

6

At this point, Officer Howard was standing in between Gessner and his front door. Gessner asked the Officers, "outside of Obama sending you, why are you here at my home?" *Id*., PageID at 302.  Officer Howard answered that they were looking for a "peeping Tom." *Id*.  Gessner responded, "What's a peeping Tom got to do with me?  I don't know anything about a peeping Tom."  *Id*., PageID at 302-03.  Officer Howard told Gessner that he needed to come out on the sidewalk and answer some questions or they would arrest him.  During this exchange, Gessner noticed a man walking by his house.  He asked the Officers why they had not stopped that man, if the President had declared martial law.  One Officer said that they had already stopped him, and he answered all their questions.

Gessner next informed the Officers that he was not going to move out to the sidewalk.  He testified:

> I sa[id] you're going to have to arrest me, I said, because I don't know anything about a peeping Tom.

> I haven't done anything wrong and I want to go inside.  You're just going to have to arrest me, and I put my hands and wrists out ... and said you're going to have to arrest me because I'm not coming out there.

(Doc. #26, PageID at 304).  Officer Trupp moved to Gessner's right side and held his right arm.  Officer Cope moved to Gessner's left side and held his left arm.  *Id*., PageID at 305, 337.  They walked him down the porch staircase.  When they reached the sidewalk, Officer Trupp let go of Gessner's arm, and Gessner turned towards Officer Cope, who was "standing there real close."  *Id*., PageID at 337.  Meanwhile, Officer Howard had walked to his cruiser.

7

Gessner then told Officer Cope, "I want all your badge numbers."  Officer Cope replied, according to Gessner, "we don't have to give you our f_ _ king badge numbers." *Id*., PageID at 306.  Gessner then asked for their names, and Officer Cope began rattling off five names.  Gessner again asked for a pen so he could write down their names.  This led to more profanity and a sudden physical restraint, according to Gessner.  He testified, "[Officer] Cope said we don't have to – we don't have any f_ _ king pen, and he grabbed me by my arm and he slings me, slam, right down onto my face ...." *Id*., PageID at 307.  More specifically, Officer Cope grabbed Gessner's left arm and "slung [him] ... face planted into [his] front yard." *Id*., PageID at 308.

Once Gessner was on the ground, lying facedown on the dry grass – a hard surface – Officer Cope jerked Gessner's left arm behind his back.  Gessner noted, "it hurt like hell...." (Doc. #26, PageID at 315-16).  Gessner alleged, "Officer Cope reached out and grabbed my neck.  Now **I know it was Cope**.  He – he held me down – my face down by my neck and he beat me in the back of my head with his bear knuckles.  **I know it was ... Cope**."  (Doc. #26, PageID at 312) (emphasis added).  At this point, Gessner "wasn't looking anywhere" because Officer Cope was holding him "face down by the back of [his] neck." *Id.*

Gessner testified that Officer Cope was the only Officer to throw him on the ground. *Id*., PageID at 313.  Officer Cope used his left hand to hold Gessner's neck and hit the back-center of Gessner's head twice with his right fist, bare knuckles.  *Id*., PageID at 316.  Gessner could not look back and see how Officer Cope kept Gessner's arms down while he punched him.  He testified, "I wasn't looking, watching but I know ... he had me by my

8

neck.  I felt his hand on my neck ....”  *Id.*, PageID at 313-14.  Gessner also testified, “he put

his left hand on my neck and held my face to the dirt.”  *Id.*, PageID at 314.

Approximately three or four seconds passed from the time Officer Cope slammed

Gessner to the ground and struck him twice.  *Id.*  Because Officer Cope held Gessner on the

ground face down, Gessner did not actually see Officer Cope deliver the two punches.

Gessner testified that Officer Cope “was the one I was talking to, he was right in front of me,

and he slammed me down, and I knew it was him because he was right over top of me and

within seconds he struck me.”  (Doc. #26, PageID at 317).  When asked the following

question, Gessner answered:

> Q:      You didn’t actually see him hit you in the back of the head, you’re just
>         assuming it was him based upon where you believe he was, correct?
>
> A.      Based upon he’s the one who grabbed me.

*Id.*  And because it happened so quickly, Gessner believes that no other Officer could have

reached a position to hit him in the back of his head.  *Id.*, PageID at 317-18.  Gessner

explains that Officer Trupp “was standing right there.  Beavers and Dorsten were standing ...

on the very front of my front yard....”  *Id.*, PageID at 313.  He is referring to the two other

Defendant Police Officers present – Michael Dorsten and Matthew T. Beavers.  Gessner

believes Officer Howard was returning from his cruiser, but he is not sure about this.

Gessner yelled for Marla a couple of times.  She did not hear anything because she

was sleeping.  Then, Officers Trupp and Cope handcuffed Gessner.  Once the handcuffs

were secure, Officer Cope grabbed Gessner’s arms and lifted his body off the ground by

grabbing between the handcuffs.  Gessner thought he felt Officer Trupp pull on his shoulder "trying to help take some tension off of him [Officer Cope] grabbing the cuffs and lifting me by the cuffs ... because that tore my skin.  And so Trupp ... actually did me a favor by pulling on me a little bit."  *Id.*, PageID at 320.

Officers Cope and Trupp pushed Gessner into a police cruiser.  Both Officers got in the front seat of the cruiser and sat for several minutes until Officer Howard came over and told them to "give him this, public intox [sic] ticket."  *Id.*, PageID at 321.  Gessner said to Officers Trupp and Cope "man, you guys are crazy...."  *Id.*  He told them he had not had a drop of alcohol, he was not publicly intoxicated, and he could walk straight.

Gessner acknowledged that Officers Howard, Dorsten, and Beavers never touched him.  He further acknowledged that he believed **only Officer Cope** used excessive force on him.  (Doc. #26, PageID at 325-26).  Officers Beavers and Dorsten did not say anything to Gessner; they were in the background and "saw the whole thing."  *Id.*, PageID at 327.  When asked during his deposition what Officers Beavers and Dorsten did wrong "that you find them to be civilly liable for?" Gessner answered, "They stood there and watched.  They didn't come to my assistance.  They just watched."  *Id.*, PageID at 328.

Officers Cope and Trupp drove Gessner to jail.  In the booking area, Gessner asked a Montgomery County Official if he could take a breathalyzer test.  The Official told Gessner that they would get him checked in, then he could see a medic.  He was booked into jail at 11:03 p.m. on August 12, 2009.

Gessner has had Type I diabetes for many years.  He takes insulin to help keep his

10

blood-glucose level close to his goal or normal range – between 80 and 120 (milligrams per deciliters). (Doc. #26, PageID at 189-92, 347). When tested at the jail, his blood glucose was 367 – over three times his goal or normal blood-glucose range. *Id.*, PageID at 347.

Gessner telephoned his girlfriend Marla who posted a bond for his release. He was released from jail at 2:30 a.m. on August 13, 2009, having spent about 3½ hours in jail. Gessner and Marla returned home where they photographed Gessner's injuries. Gessner described one photo as showing injuries to the side of his face and forehead. *Id.*, PageID at 354-55. They did not photograph the back of his head because the swelling – the "lump" – he sustained was covered by his hair and could not be seen. *Id.*, PageID at 356.

On August 13, 2009, the morning after the incident, Gessner went to the Veterans' Administration Medical Center in Dayton for medical treatment. He did not receive more treatment for his physical injuries with the possible exception of one other visit to the VA Medical Center "about possibly looking at [his] left arm, and that's when they told [him] that [he] should come to therapy." (Doc. #26, PageID at 364).

He began to see psychologist Dr. DeMarchis for depression and continued to see him for two years. Among the many things Gessner doubtlessly told Dr. DeMarchis was that the last ten years of his life had been consumed by legal issues and by the pursuit of justice. (Doc. #26, PageID at 245). Gessner testified, "It's consumed me." *Id.*

Gessner had previously received individual psychotherapy from Arthur L. Aaronson, Psy.D. An Exhibit attached to Gessner's deposition indicates that on October 12, 2005, Dr. Aaronson wrote a progress note stating, "Mark continues to rant about his lawsuits. I ask

11

him why he is com[]ing to therapy and he says to make him less paranoid.  He continues to

believe that he needs to stand up for his rights and that litigation is the way to do so.  He is

loud and angry in his demeanor ....  He tells me that his life has been robbed because of the

police brutality.  He wants his life back but he is unwilling to assume that any part of his

problem []is his.  He sees his fighting for his case as a moral imperative." (Doc. #36,

PageID at 776).

On or around August 21, 2009, Gessner met with the Dayton Police Department's

Internal Affairs Division.  During his deposition, Gessner testified that they took several

photos of abrasion injuries on his wrists.  He further testified that he "heals real slow" due to

his Type I diabetes.  (Doc. #26, PageID at 360).  He estimated that it took over a month, up

to two months for the scabbing and redness on his wrists to heal.  By then, the abrasion on

his forehead had also healed.   And the lump on his head was sore but eventually dissipated

within three months.  Several photos are attached as Exhibits to Gessner's deposition.  One

photo, dated August 13, 2009, shows an abrasion in the upper-right area of his forehead.

(Doc. #36, PageID at 779).  Two other photos also attached as Exhibits to his deposition

were apparently taken at the time of Gessner's interview with Internal Affairs on August 18,

2009.  One photo shows a small abrasion on Gessner's wrist; the other shows an abrasion on

his right forearm.  *Id*., PageID at 773-74.

**B.**     **Ms. Rhodes**

Gessner's long-time girlfriend, Marla Rhodes, lived with Gessner at his house on

Wyoming Street.  She has no personal knowledge of anything that occurred during the

12

events at issue until Gessner's phone call woke her around 1:30 AM. (Doc. #37, PageID at 797). She confirmed during her deposition that she went to the jail, posted bail, and drove Gessner home.

Ms. Rhodes noticed an abrasion and bruising on Gessner's forehead. The mark was red, and it looked like it was going to bruise. She also saw abrasions on Gessner's wrists, "around his wrists ... along his arms," and she "[f]elt a lump on the back of his head." *Id*., PageID at 796. The lump on Gessner's head was about one inch long; it was not bleeding. Ms. Rhodes acknowledged that she felt "slight" swelling. *Id*., PageID at 797. The red marks on Gessner's wrists went away within a week or two, to the best of Ms. Rhodes' recollection. *Id*. She confirmed that after the incident, Gessner went to the VA hospital, but she is not aware of any other medical treatment he received for the injuries she saw. She does remember that Gessner saw a clinical psychologist for a couple of years.

Ms. Rhodes testified that when she arrived home from work in the mid-afternoon on the date Gessner was arrested, she did not see anything that indicated he had been drinking alcohol. His eyes were "clear." *Id*., PageID at 823.

    **C.**    <u>**Officer Howard's Affidavit and Deposition**</u>

**1.**

Officer Howard describes the events at issue in his affidavit. He states that he was on duty as a Dayton Police Officer during the evening of August 12, 2009. He was dispatched to the vicinity of Wyoming and Cross Streets "on a call of a suspicious person." (Doc. #25, PageID at 152). He asserts, "The Dayton Police Department received three separate calls

13

about a suspicious white male walking up and peering into homes and cars in that area." *Id*.

When Officer Howard arrived on Cross Street, north of Wyoming, he saw a white male. Howard obtained the man's name and information and asked him what he was doing in the area. Apparently satisfied with the man's explanation, Officer Howard let him go.

Officer Howard next drove toward Wyoming Street. He "noticed a white male, later identified as Plaintiff, standing at the corner at Wyoming Street." *Id*., PageID at 153. As Howard got closer, Plaintiff turned and walked away at a fast pace. He appeared to Howard "as if he was trying to avoid me." *Id*.

Officer Howard's affidavit continues:

> I pulled along side of the Plaintiff and turned my spotlight on the Plaintiff in front of 467 Wyoming St. and the Plaintiff sat down on the porch.

> As soon as I got out of my cruiser and attempted to talk to the Plaintiff he got up and ran for the door of the home.

> When I attempted to talk to Plaintiff he immediately started yelling and swearing at me and behaving erratically.

> I also noticed that the Plaintiff smelled of alcohol and had blood shot eyes.

> The Plaintiff refused to calm down or to show me identification when requested.

> As a result of his behavior the Plaintiff was arrested.

(Doc. #25, PageID at 153)(paragraph numbers omitted). Officer Howard concludes, "I did not see any officer strike the Plaintiff nor did I see anyone use excessive force to arrest the Plaintiff." *Id*.

14

**2.**

Officer Howard provided additional details during his deposition.[4] He testified that when he first noticed Gessner standing at the corner of Wyoming and Cross Streets, Gessner "quickly turned and proceeded to walk westbound on Wyoming." (Doc. #38, PageID 878). Gessner asked Officer Howard, "You testified that you saw me quickly walking away[?]" Officer Howard answered, "Yes." *Id.*, PageID at 881.

Officer Howard further testified that at the time of the incident, he had no idea why Gessner walked to that particular home, but it was "strange" to him. When asked why it was strange to him, Officer Howard explained, "Because of the nature of the call I was on, the area in which I was operating in, your [Gessner's] activity upon seeing me head toward you, and then your action upon me turning on my spotlight and you sitting down ending your destination, coming to the end of your destination at 467 Wyoming, all that was strange to me." (Doc. #38, PageID at 894-95). When asked why he chased Gessner, Officer Howard similarly explained:

> The nature of the call I was on. The time of day. The area in which this call took[ ] place. Your [Gessner's] actions upon seeing me head towards you, you deliberately walking fast trying to avoid contact with me. You looking at the ground avoiding eye contact. Not looking about your person.
>
> Upon me ... turning my spotlight, sitting down, me getting out of my car and you fleeing on foot aroused my suspicious [sic].

---

[4] Gessner, proceeding *pro se*, deposed each Defendant Police Officer.

15

(Doc. #38, PageID at 897-98).

Officer Howard explained, "As soon as you made it to the porch and I made it to the porch with you, you immediately begin [sic] started yelling, cussing, screaming, and I kind of walked around between where I put my back to the door and ... you were to my front...." *Id*., PageID at 928.  Officer Howard put his hands up and told Gessner to calm down.  He explained to Gessner that he was investigating a suspicious person, and Gessner replied "that has nothing to do with me, get the f_ _k away from me...."  *Id*., PageID at 931-32.  Officer Howard next asked Gessner for identification to prove he lived there, and he told Gessner that he would be glad to leave after Gessner proved he lived there.

By this time, four more Police Officers had arrived at the scene.  Officer Howard walked to his cruiser to get his ticket book with the intention of writing a ticket charging Gessner with public intoxication.  *Id*., PageID at 909.  According to Officer Howard, Gessner "had the smell of an alcoholic beverage emitting from breath and person, and ... did have red, bloodshot, watery eyes." *Id*., PageID at 922.  When Officer Howard returned from his cruiser, he told Gessner he was under arrest.  *Id*., PageID at 912.  He handcuffed Gessner's right wrist.  Officer Howard described the next events as follows:

> You [Gessner] proceeded to continue to yell, jerk away, pull away, cussing, screaming as you w[ere] pulling away and you refused to calm down.
>
> Sergeant Beavers[5] subsequently grabbed ahold of your right shoulder, chest area..., your left upper half portion that consists of your shoulder, your back...,

---

[5] Officer Beavers was promoted to Sergeant sometime after the incident at issue in this case.  He is referred to in this case as Officer Beavers, consistent with his rank at the time of the incident.

16

and we all set you on the ground, for lack of better terms, placed you onto your
stomach area.

Once this was done, we w[ere] able to bring your left hand and arm into
control and subsequently secure it with the handcuff.

(Doc. #38, PageID at 913-14)(footnote added).  The "we" referenced by Officer Howard

included himself, Officers Cope, Trupp, and Beavers.  Officer Howard noted, "All of us

were there.  All of us had ... one form or another of your [Gessner's] body.  Some of us had

your hand, your chest, your shoulders."  *Id.*, PageID at 914.

### D.    Officer Cope

Although Defendants do not presently seek summary judgment in Officer Cope's

favor, discussion of his deposition testimony helps flesh out the record.

Officers Cope and Trupp were patrolling in the same police cruiser on the night of

Gessner's arrest.  During his deposition, Officer Cope testified that they were patrolling on

Wyoming Street when he noticed that Officer Howard's cruiser was parked.  He saw Officer

Howard exit his cruiser and begin running or hurrying.  By the time Officers Cope and

Trupp exited their vehicle, Officer Howard was on the front porch of a house where Gessner

was yelling at him.  Officer Cope recalls Officer Howard asking Gessner for identification

and Gessner responded by "flapping" his wallet in Officer Howard's face.  (Doc. #44,

PageID at 1317, 1335).  Officers Dorsten and Beavers soon arrived.

Officer Cope explained that from a safety standpoint, "we don't like being on

people's porches, we don't know what's on the other side of that door...."  *Id.*, PageID at

1336.  He further explained:

17

It could very easily have been a trap.  It could have been an ambush.  Who knows what's on the other side of that door.

I don't know if you [Gessner] actually live there or if you're just pretending to live there to get away from ... further scrutiny from us, if you were actually up to no good.

At that point, nobody really knows, but assuredly if it was an ambush, it would be much safer for us to have you out and away from that enclosed area, like the porch, and away from any threat that may be on the other side of that door.

(Doc. #44, PageID at 1349-50).  Because of this, Officer Cope asked Gessner to step down off the porch to the front yard.  *Id.*, PageID at 1336.

According to Officer Cope, as Officer Howard attempted to explain to Gessner why the Officers were there, Gessner continued yelling at Officer Howard that he lived there and ordering Officer Howard off his property.  Officer Cope described Gessner's behavior at this point as "really erratic."  *Id.*, PageID at 1342.  Officer Howard told Gessner that he needed to calm down.  Officer Howard also told Gessner that he looked intoxicated.  According to Officer Cope, Officer Howard then asked Gessner to step off the porch because he kept banging on the front door.

When asked if it would have been reasonable for Officer Howard to perform a *Terry* pat down or frisk, Officer Cope answered, "That would have been Officer Howard's call.  It was Officer Howard's ... interaction.  I was just there to back him up...."  *Id.*, PageID at 1351.

Gessner asked for the Officers' names and badge numbers.  Officer Cope began writing down this information, but "it got more and more elevated between [Gessner] and

Howard." *Id*., PageID at 1343.  Officer Cope testified during his deposition, "At that point, I remember Officer Howard advising you [Gessner] that he was going to ... place you under arrest.  You began to walk away.  He tried to grab ahold of you.  You began to resist." *Id*. Officer Cope saw Officer Howard grab Gessner's right arm.  Officer Cope grabbed Gessner's left arm and tried to move it behind Gessner's back.  By this time, Officer Howard had handcuffed Gessner's right wrist.  Gessner was leaning forward and Officer Beavers, who had Gessner's right shoulder, used Gessner's forward momentum to place him on the ground.  *Id*., PageID at 1354-55.

Officer Cope does not recall who handcuffed Gessner's left wrist, and he does not remember helping the Officers lift Gessner off the ground.

### E.    Officer Trupp

On the night of Gessner's arrest, Officer Trupp remembers patrolling with Officer Cope and receiving the dispatch concerning a report of a suspicious person.  An Exhibit attached to Officer Trupp's deposition appears to document the 911 call that led to the dispatch.  The caller reported that a short white male with a white rag on his head and dark clothing was "walking up to houses looking into windows."  (Doc. #45, PageID at 1786).

When Officers Trupp and Cope received the dispatch, they were already in the area of Wyoming and Cross.  While driving on Cross Street, Officer Trupp saw Officer Howard speaking with a man.  As Officers Trupp and Cope exited their cruiser and arrived at that scene, Officer Howard was releasing the man.  Officers Trupp and Cope returned to their cruiser and drove away, presumably still searching for the suspicious person.

19

During Officer Trupp's deposition, he was asked to read aloud the report he wrote about the incident on August 18, 2009.  Officer Trupp's report states that while driving on Wyoming Street, he saw a white male running onto the porch at 467 Wyoming.  Officer Howard was running towards the man.  (Doc. #45, PageID at 1758, 1791).

Officer Trupp testified that he exited his vehicle and heard the individual on the porch – later discovered to be Gessner – yelling at Officer Howard.  Trupp stated in his report, which (again) he was asked to read at his deposition:

> As we approached the front porch of 467 Wyoming Street I asked the subject to calm down and he responded to Officer's [sic] by cursing several times and telling Officers to "get the f_ _k off his property."  We then asked the subject to provide us with his identification and he pulled his wallet out of his pocket and began screaming and cursing again at Officer's [sic].  He then quickly put his wallet back into his pocket.  It is important to note that [the] Officers could observe a strong odor of alcoholic beverage on his breath, red glazed eyes and very slurred speech....

(Doc. #45, PageID at 1758-59, 1791).

Officer Trupp testified that he remained with Officer Cope on the porch while Officer Howard went to his cruiser and returned.  Gessner was flapping his billfold and yelling at the Officers.  When they asked him to calm down, he "stated f_ _k you."  *Id*., PageID at 1768.  Officer Trupp testified, "We advised you [Gessner] that you were under arrest ...."  *Id*.  Officer Trupp explained that Gessner was under arrest for obstructing official business, failure to provide proper identification, and disorderly conduct.  Officer Trupp began to escort Gessner off the porch.  When they reached the sidewalk and began walking toward the street.  Officer Trupp testified, "A handcuff was placed on your right arm by Officer

20

Howard.  You pulled away from us and you were placed on the ground in the grassy area and your other arm was handcuffed."  (Doc. #45, PageID at 1770).  Officer Trupp does not recall who did the take-down, and he does not recall "how the actual placement on the ground was done."  *Id*., PageID at 1770.

By this time, three Officers had touched Gessner: Officers Trupp, Howard, and Cope.  Once Officer Howard handcuffed Gessner's right wrist, Officer Trupp released him.  Officer Trupp thinks that Officer Howard handcuffed Gessner's left wrist after he was on the ground.  The Officers then helped Gessner stand, although Officer Trupp does not remember which Officers helped.  *Id*., PageID at 170-72.

Gessner was placed in the cruiser.  Officers Trupp and Cope drove him to jail and took him into the booking area.

Officer Trupp does not recall Gessner asking who sent them.  And Officer Trupp does not recall saying it was Obama that sent them to Gessner's home.  Officer Trupp also does not remember Officer Howard telling Gessner that Obama had sent them.  *Id*., PageID at 1776.

### F.    Officer Dorsten and Officer Beavers

Officers Dorsten and Beavers were patrolling in the same cruiser on the night of Gessner's arrest.[6]  They were dispatched to the area of Cross Street and Park Drive "on a suspicious person call."  (Doc. #42, PageID at 1132).

---

[6]  Officer Dorsten was no longer a police officer at the time of his deposition.

Officer Dorsten testified during his deposition that when they turned from Cross Street to Wyoming Drive, he noticed Officer Howard exit his car and follow a "suspicious person." *Id*., PageID at 1139.  From his position on the public sidewalk in front of a house, Officer Dorsten saw Gessner on the front porch of the house.  Officer Dorsten described Gessner's behavior as follows:  "You [Gessner] would not supply any type of identification for anyone.  You were screaming, acting erratic, and using basically very, very argumentative and verbal language that's not suitable in public.  That is suspicious behavior ...." *Id*., PageID at 1142.  Officer Dorsten testified that the Officers explained to Gessner that he was going to have to calm down.  *Id*., PageID at 1175.

When asked if he saw an arrest being made, Officer Dorsten stated, "Disorderly conduct. Verbally abusive.  Screaming.  Yelling.  Actions that ... a suspicious person would do." *Id*., PageID at 1145-46.  Officer Dorsten did not recall who was the first to grab Gessner's arm, but he did recall that Gessner was arrested.  After reviewing the arrest report, Officer Dorsten testified – consistent with the arrest report – that Officers Howard and Trupp effected Gessner's arrest.  (Doc. #42, PageID at 1154, 1184, Exhibit 22).  Officer Dorsten testified, "I'm not sure which officer had to place you down on your stomach region and your chest ... to the ground to try to get you under control and place a – another handcuff on your – on your hands, but also to help you from not hurting yourself ...." *Id*., PageID at 1157.  Officer Dorsten also stated that he did not arrest, and never touched, Gessner.  *Id*., PageID at 1164, 1173.

Officer Beavers testified that he saw Gessner running and Officer Howard chasing

22

him. (Doc. #39, PageID at 978). According to Officer Beavers:

> After Officer Howard had approached you [Gessner] as you were running towards your porch, Officer Dorsten and I ended up parking in front of your house on Wyoming Street. We could hear you screaming and cussing at Officer Howard. We exited the cruiser.
>
> Officer Howard, Officer Trupp, and Officer Cope were attempting to calm you down and attempting to ascertain your identification. You still were screaming and cussing and yelling at them.
>
> After a few minutes of this, you were advised that you were under arrest. Attempt was made to place you in handcuffs.
>
> This apparently angered you more, at which point you began to pull away, and at that point, you were placed in the grass on the ground and the second handcuff was placed on you.
>
> After that, after both hands were secured, you were picked off the ground and you were walked over to Officer Trupp and Cope's cruiser and they ended up transporting you to jail.

(Doc. #39, PageID at 975-76).

## III. <u>Discussion</u>

### A. <u>Summary Judgment Standards</u>

A party is entitled to summary judgment when there is no genuine dispute over any material fact and when the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Barker v. Goodrich*, 649 F.3d 428, 432 (6th Cir. 2011).

To resolve whether a genuine issue of material fact exists, the Court draws all reasonable inferences in the light most favorable to the non-moving party. *Richland Bookmart, Inc. v. Knox County, Tenn.*, 555 F.3d 512, 520 (6th Cir. 2009)(citing *Matsushita*

23

*Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88, 106 S.Ct. 1348 (1986)).

With these reasonable inferences in the forefront, "[t]he central issue is 'whether the

evidence presents a sufficient disagreement to require submission to a jury or whether it is

so one-sided that one party must prevail as a matter of law.'"  *Jones v. Potter*, 488 F.3d 397,

402-03 (6th Cir. 2007) (quoting, in part, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-

52 (1986) and citing *Matsushita Elec.*, 475 U.S. at 587).  "Accordingly, '[e]ntry of summary

judgment is appropriate 'against a party who fails to make a showing sufficient to establish

the existence of an element essential to that party's case, and on which that party will bear

the burden of proof at trial.'"  *Whitfield v. Tennessee*, 639 F.3d 253, 258 (6th Cir. 2011)

(citations omitted).

### B.     Gessner's Federal Claims and Qualified Immunity

Gessner's federal constitutional claims and remedies arise under 42 U.S.C. §1983,

which provides in part:

> Every person who, under color of any statute ... of any State..., subjects,
> or causes to be subjected, any citizen of the United States ... to the deprivation
> of any rights, privileges, or immunities secured by the Constitution and laws,
> shall be liable to the party injured....

*See Brannum v. Overton County School Bd.*, 516 F.3d 489, 493 (6th Cir. 2008).  To prevail

on a §1983 claim "a plaintiff must demonstrate '(1) the deprivation of a right secured by the

Constitution or laws of the United States (2) caused by a person acting under the color of

state law.'"  *Jones v. Muskegon County*, 625 F.3d 935, 941 (6th Cir. 2010) (quoting

*Dominguez v. Corr. Med. Servs.,* 555 F.3d 543, 549 (6th Cir.2009)); *see Radvansky v. City*

24

*of Olmsted Falls*, 395 F.3d 291, 302 (6th Cir. 2005).

Defendants argue that qualified immunity bars Gessner's federal claims against the Defendant Police Officers except Officer Cope.

"The doctrine of qualified immunity precludes actions for damages against government officials on the basis of discretionary actions that do not 'violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Harris v. Bornhorst*, 513 F.3d 503, 511 (6th Cir. 2008)(quoting in part *Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999)(en banc)). "The central purpose of affording public officials qualified immunity from suit is to protect them 'from undue interference with their duties and from potentially disabling threats of liability.'" *Binay v. Bettendorf*, 601 F.3d 640, 646 (6th Cir. 2010) (quoting *Elder v. Holloway,* 510 U.S. 510, 514, 114 S.Ct. 1019 (1994)) (other citation omitted).

A two-tiered inquiry controls whether qualified immunity shields a police officer from a §1983 lawsuit:  The first inquiry asks whether the plaintiff has alleged facts or shown that the officer's conduct violated a federal constitutional right.  The second inquiry asks whether the federal constitutional right was clearly established at the time the officer's purported misconduct occurred.  *Pearson v. Callahan,* 555 U.S. 223, 232, 129 S.Ct. 808 (2009); *see Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151 (2001); *see also Austin v. Redford Twp. Police Dept*., 690 F.3d 490, 496 (6th Cir. 2012); *Labensky v. Cornwell*, 763 F.Supp.2d 921, 927-28 (S.D. Ohio 2010)(Rose, D.J.).  Either of these inquiries may be considered first; either alone may be dispositive.  *Pearson*, 555 U.S. at 236, 129 S.Ct. 808;

25

*see Austin*, 690 F.3d at 496.

Because Defendants Howard, Trupp, Dorsten, and Beavers assert qualified immunity as a defense, Gessner bears the burden of demonstrating that qualified immunity does not shield each Officer from his federal constitutional claims.  *Austin*, 690 F.3d at 496 (citing *Silberstein v. City of Dayton,* 440 F.3d 306, 311 (6th Cir.2006)) (other citation omitted).

### C.    Stop then Arrest

### 1.

Gessner argues that Officer Howard lacked reasonable suspicion to stop him contrary to *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868 (1968).

Under *Terry*, "[p]olice may briefly stop an individual for investigation if they have a 'reasonable suspicion' that the individual has committed a crime."  *Houston v. Clark County Sheriff Deputy John Does 1-5*, 174 F.3d 809, 813 (6th Cir. 1999).

> "Reasonable suspicion" is more than an ill-defined hunch; it must be based upon "a particularized and objective basis for suspecting the particular person ... of criminal activity."  It requires "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" an investigatory stop.  The standard outlined in *Terry* and its progeny is not onerous.  The requisite level of suspicion "is considerably less than proof of wrongdoing by a preponderance of the evidence."  Moreover, reasonable suspicion can arise from evidence that is less reliable than what might be required to show probable cause.

*Houston*, 174 F.3d at 813 (citing *Terry*, 392 U.S. at 21; *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581 (1989)) (other citations omitted).  "The historical facts and circumstances pertinent to the 'reasonable suspicion' inquiry pose pure factual issues, whereas the ultimate 'reasonable suspicion' query constitutes a mixed issue of law and fact."

26

*Painter v. Robertson*, 185 F.3d 557, 568 (6th Cir. 1999).

During his deposition, Officer Howard repeatedly gave several reasons for stopping Gessner.  Viewed as matters of pure historical fact, no genuine dispute exists in the record concerning the accuracy of Officer Howard's reasons.  These genuinely undisputed reasons, viewed in the totality of the circumstances Officer Howard faced, constitute specific articulable facts and, hence, reasonable suspicion to perform a *Terry* stop to determine if Gessner had been engaged in recent criminal conduct.

Officer Howard was responding to a police dispatch concerning a suspicious person possibly looking into houses or cars.  Officer Howard testified, "That's normally what burglars do before they commit a crime, casing a house or looking into a house."  (Doc. #38, PageID at 905).  It was dark outside (10:00 p.m.).  Before seeing or stopping Gessner, Officer Howard had briefly stopped, questioned, and released another person.  Officer Howard then noticed Gessner standing at a nearby corner looking in his direction and Gessner turned and speed-walked away (Gessner's description).  Accepting Gessner's testimony as true, he had not been involved in criminal activity at any time on that date (August 12, 2009).  Still, it was reasonable for Officer Howard to become suspicious of Gessner given the neighborhood they were in, the nature of the dispatch Officer Howard had received, and the fact that Gessner looked at Officer Howard, then appeared to want to avoid contact with Officer Howard by speed-walking away.  *See United States v. Arvizu,* 534 U.S. 266, 277, 122 S.Ct. 744 (2002) ("A determination that reasonable suspicion exists ... need not rule out the possibility of innocent conduct."); *see also United States v. Luqman*, 522

27

F.3d 613, 617 (6th Cir. 2008) (criminal patterns in an area and flight from a known area of

criminal activity are factors applicable to determining if reasonable suspicion existed) (citing

*Illinois v. Wardlow,* 528 U.S. 119, 124, 120 S.Ct. 673 (2000)); *United States v. Smith*, 427

Fed. Appx. 413, 419 (6th Cir. 2011) ("'the abruptness ... of a suspect's departure upon

noticing the police' is a factor that may contribute to an officer's reasonable suspicion."

quoting *United States v. Johnson*, 620 F.3d 685, 694 (6th Cir. 2010)).  Officer Howard

explained to Gessner during his (Howard's) deposition, "I thought you w[ere] connected

with the call ... I was on."  (Doc. #38, PageID at 906).  He further explained that he was

concerned that there might be more than one suspicious person in the area, having already

interviewed one person.  Officer Howard testified, "My thought process was that from my

training ... and ... my experience on the road ... that routinely of theft offenses ... there is

more than one person involved.  I don't know if he was the lookout, if he was helping carry

the product or if he was operating ... a nearby ... stash location or he was possibly driving a

car to stash the merchandise and drive away.   (Doc. #38, PageID 905-06).

In the totality of the circumstances and in light of the above specific articulable facts,

Officer Howard was not working on a mere hunch; he had reasonable suspicion to perform a

*Terry* stop for the purpose of investigating whether Gessner was, or had been, engaged in

recent criminal activity.  Furthermore, a reasonable officer in the circumstances Officer

Howard faced would not have known that performing a *Terry* stop based on the above-stated

specific articulable facts would violate Gessner's clearly established Fourth Amendment

rights.  *See Wardlow*, 528 U.S. at 124-25, 120 S.Ct. 673; *see also Lee v. Hefner*, 136 Fed.

28

Appx. 807, 812 (6th Cir. 2005).

Accordingly, Officer Howard is entitled to summary judgment on Gessner's claim that the *Terry* stop violated his rights under the Fourth and Fourteenth Amendments.

**2.**

There is no genuine dispute over the fact that Gessner moved off the front porch at the Officers' insistence. And there is no genuine dispute over the fact that he was physically forced to the ground, then handcuffed, then jailed. Consequently, at some point after the *Terry* stop began, the stop became an arrest, necessitating the existence of probable cause to satisfy the Fourth Amendment. *Gardenhire v. Schubert*, 205 F.3d 303, 315 (6th Cir. 2000)("Any arrest, whether formal or *de facto,* requires probable cause.").

> An investigative *Terry* stop may indeed ripen into an arrest through the passage of time or the use of force. When this occurs, the continued detention of suspects must be based upon probable cause. Although there is no bright line that distinguishes an investigative stop from a *de facto* arrest, the length and manner of an investigative stop should be reasonably related to the basis for the initial intrusion.

*Houston*, 174 F.3d at 814 (internal citations omitted). "'[T]he mere use or display of force in making a stop will not necessarily convert a stop into an arrest.'" *Feathers v. Aey*, 319 F.3d 843, 851 (6th Cir. 2003)(citation omitted). "If the force was necessary to effect the *Terry* stop, [courts] consider it part of the *Terry* stop; if the force went beyond that necessary for the *Terry* stop, [courts] interpret it as a signal that the confrontation had escalated into an arrest. *Feathers*, 319 F.3d at 851.

There is a genuine factual dispute over Gessner's behavior once the Officers arrived

29

on his porch.  Yet accepting Gessner's deposition testimony as true reveals allegations sufficient to show that the *Terry* stop did not ripen into an arrest until Officer Cope allegedly slammed him to the ground and handcuffed him.

The Officers did not touch or physically restrain Gessner when they arrived on his front porch.  Officer Howard first asked Gessner to get away from the front door.  Gessner then asked why and told Officer Howard that this was his home.  He also stated that he wanted to go inside, and he offered to show his driver's license with the same address as the house.  He also wanted to knock on the door to wake up his sleeping wife.  Officer Howard told Gessner, "no you're not going to do that, you're not going to come near this door." (Doc. #26, PageID at 286).  At this point, the *Terry* stop had not ripened into an arrest because Officer Howard's comment was necessary to accomplish the purpose of the *Terry* stop – to briefly detain Gessner for the purpose of investigating whether he was the suspicious person they were looking for.

Gessner testified that Officer Trupp at this point took his arm and started to pull him away.  Gessner explained, "So what I did is I pounded on my door casing."  (Doc. #26, PageID at 288).  Officer Trupp then continued to pull Gessner away from the door, preventing him from knocking more.  This minor use of force was within the scope of the *Terry* stop and, as Officer Cope explained, helped protect the Officers from danger or ambush by any unseen people in the house.  (Doc. #44, PageID at 1349-50).  Gessner testified that he then pulled his wallet out of his back pants pocket and held it so Officer Howard could see his driver's license.  He did not hand his wallet to Officer Howard, and

Officer Howard did not look at Gessner's wallet.  During Officer Trupp's deposition, Gessner asked him to read aloud part of his written report of the incident.  Officer Trupp wrote in his report that Gessner "quickly put his wallet back into his pocket." (Doc. #45, PageID at 1759).  Gessner has not presented any contrary affirmative testimony or other evidence on this point, and it therefore stands as a genuinely undisputed fact that he quickly put his wallet into his back pocket.  *See Street v. J.C. Bradford & Co.*, 886 F.3d 1472, 1479 (6th Cir. 1989)(nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'").

Officer Cope was standing on the sidewalk in front of the stairs to the house.  After further brief comments between Gessner and Officer Cope, Officer Cope told Gessner that he needed to "come out here and answer some questions..." and if he did not he was "going to be arrested."  (Doc. #26, PageID at 298).  Gessner responded that he had already answered their questions and he acknowledged during his deposition that he "didn't want to go to that sidewalk, I wanted to stay right there and go in my home."  *Id.*, PageID at 301. Further brief discussion occurred, then Gessner commented, in part, "you're going to have to arrest me because I don't know anything about a peeping Tom."  *Id.*, PageID at 304.  He testified, "[I] put my hands and wrists out and said you're going to have to arrest me because I'm not coming out there."  *Id.*  Officers Cope and Trupp moved beside Gessner and walked him down the porch staircase.  Although Officer Trupp grabbed Gessner's left arm, he released Gessner when they reached the sidewalk.

31

The *Terry* stop had still not ripened into an arrest at this point and did not do so until Officer Cope allegedly slammed Gessner to the ground where he was handcuffed. Before this, only Officer Trupp had briefly touched Gessner. He was, moreover, away from the front door, off the porch, and in the safer place (standing on the sidewalk) where the Officers wanted him to be. Gessner's presence on the sidewalk, moreover, was in line with Officer Cope's statement that Gessner would be arrested if he did not move down to the sidewalk. And, once Officer Trupp let go of Gessner's arm, no Officer touched him when they first reached the sidewalk. All these circumstances show that the *Terry* stop, which had lasted only a brief time, remained within the scope of its original purpose.

Further comments ensued concerning Gessner's desire to write down the Officers' badge numbers and names. Then Officer Cope used (allegedly) an amount of force that went beyond the purpose of the *Terry* stop, and into an arrest, by slamming Gessner to the ground where he was quickly handcuffed. *See Feathers*, 319 F.3d at 851.

As noted above, Gessner's actual arrest must be supported by probable cause to be permissible under the Fourth Amendment. *See Gardenhire*, 205 F.3d at 315.

**3.**

"For a police officer to have probable cause for arrest, there must be 'facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing or is about to commit an offense.'" *Crockett v. Cumberland Coll*., 316 F.3d 571, 580 (6th Cir. 2003) (quoting, in part, *Michigan v. DeFillippo,* 443 U.S. 31, 37,

99 S.Ct. 2627 (1979) and citing *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223 (1964)) (other

citations omitted).  "Probable cause is assessed 'from the perspective of a reasonable officer

on the scene, rather than with the 20/20 vision of hindsight.'" *Radvansky v. City of Olmsted*

*Falls*, 496 F.3d 609, 615 (6th Cir. 2007) (citation omitted).  "Probable cause requires only

the probability of criminal activity not some type of 'prima facie' showing." *Criss v. City of*

*Kent,* 867 F.2d 259, 262 (6th Cir. 1988).  "The Fourth Amendment, after all, necessitates an

inquiry into probabilities, not certainty." *United States v. Strickland,* 144 F.3d 412, 415 (6th

Cir. 1998).  "The probability of criminal activity is assessed under a reasonableness standard

based on 'an examination of all facts and circumstances *within an officer's knowledge at the*

*time of an arrest.*'" *Crockett*, 316 F.3d at 580 (italics in *Crockett*) (quoting, in part, *Estate of*

*Dietrich v. Burrows*, 167 F.3d 1007, 1012 (6th Cir. 1999))(other citation omitted)

"In general, the existence of probable cause in a § 1983 action presents a jury

question, unless there is only one reasonable determination possible." *Pyles v. Raisor,* 60

F.3d 1211, 1215 (6th Cir. 1995).

Gessner was arrested and charged with several misdemeanor violations of Ohio law.

As long as probable cause existed as to at least one charge, his arrest was lawful.  *Lyons v.*

*City of Xenia*, 417 F.3d 565, 573 (6th Cir. 2005).  Gessner was charged with failure to

disclose personal information, a violation of Ohio Rev. Code §2921.29(A)(1).  This fourth

degree misdemeanor (with a maximum jail sentence of 30 days) is prohibited as follows:

> No person who is in a public place shall refuse to disclose the person's name,
> address, or date of birth, when requested by a law enforcement officer who
> reasonably suspects either of the following:

33

(1) The person is committing, has committed, or is about to commit a criminal
offense.

Ohio Rev. Code §2921.29(A).

Accepting Gessner's version of the events as true demonstrates the Officers had a

reasonable basis to conclude that Gessner violated this statute.  Gessner's only effort to

show the Officers his driver's license occurred after Officer Trupp grabbed him by the arm

and pulled him away from the front door.  Gessner, however, did not hand his wallet to

Officer Howard; he merely pointed at his address.  (Doc. #26, PageID at 292).  And, there is

no genuine issue over the fact that he quickly put his wallet back into his pocket.  (Doc. #45,

PageID at 1758, 1791).  Most significantly, this occurred in fast-developing circumstances

after Officer Trupp grabbed Gessner's arm and pulled him away from the front door.  By the

time this occurred, Officer Howard had asked Gessner, "How do we know this is your

home?"  (Doc. #26, PageID at 284).  Shortly after Gessner's arm was grabbed, Officer Cope

told him that he wanted him to come down to the sidewalk and answer some questions or he

would be arrested.  And Officer Howard informed Gessner that they were looking for a

peeping Tom.  Yet Gessner continued to ask questions rather than move off the porch to the

sidewalk, and he testified that he told the Officers he had already answered all their

questions.  He then told the Officers that he was not moving to the sidewalk and that they

would need to arrest him, putting his hands and wrists in front of him.  Gessner does not

allege that he tried to show the Officers his wallet or driver's license after Officers Trupp

and Cope escorted him to the sidewalk.  He instead began to ask the Officers for their names

34

and badge numbers. His questions, while proper in some contexts, continued to deprive the Officers of the information they needed – specifically his identity and proof that he lived in the house he was attempting to enter. Gessner's description of his discussion with the Officers reveals that he knew the Officers wanted proof that he lived in the house. With all these facts in mind, and under the circumstances, a prudent officer could reach only one reasonable conclusion: there was a reasonable probability that Gessner had failed to identify himself in violation of Ohio Rev. Code § 2921.29(A)(1). *Strickland,* 144 F.3d at 415 ("The Fourth Amendment, after all, necessitates an inquiry into probabilities, not certainty.").

Additionally, even if officers could reasonably disagree about whether probable cause existed to arrest Gessner for violating Ohio Rev. Code § 2921.29(A)(1), the Defendant Officers are entitled to qualified immunity from Gessner's Fourth Amendment/lack of probable cause claim. An objective officer in their situation, under all the facts and circumstances, would not know that arresting Gessner for this misdemeanor offense violated clearly established Fourth Amendment law. "As the Supreme Court has explained, '[t]he concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct.' Qualified immunity leaves government authorities 'ample room for mistaken judgments.' The doctrine protects "all but the plainly incompetent or those who knowingly violate the law.'" *Humphrey v. Mabry*, 482 F.3d 840, 847 (6th Cir. 2007) (quoting, in part, *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092 (1986)) (other citations omitted).

Accordingly, Defendants Howard, Trupp, Dorsten, and Beavers are entitled to

35

summary judgment on Gessner's claim that he was arrested without probable cause in violation of the Fourth and Fourteenth Amendments.

### D.     **Arrest – Excessive Force**

"Under the Fourth Amendment..., individuals ... have a right to be free from excessive force when police make an arrest or seizure." *Lyons*, 417 F.3d at 575 (citing *Graham v. Connor*, 490 U.S. 386, 394-95, 109 S.Ct. 1865 (1989)).

The focus of Gessner's Fourth Amendment excessive force claim is upon his allegation that one Police Officer slammed him to the ground, face down, and punched him twice in the back of his head.  Accepting Gessner's deposition testimony as true, Officer Cope was the only Officer who did this to him.  (Doc. #26, PageID at 316-17).  Gessner repeatedly identified Officer Cope as the one who slammed and punched him.  *Id*., PageID at 307-317.  Gessner also described Officer Cope as the "guy with the short reddish hair." *Id*., PageID at 295.

Gessner did not actually see Officer Cope punch him because Officer Cope held him by the neck face down.  But Gessner insisted during his deposition that it was Officer Cope.  Gessner testified, "he was – he was the one I was talking to, he was right in front of me, and he slammed me down, and I knew it was him because he was right over top of me and within seconds he struck me." *Id*., PageID at 317.

Perhaps because of this, Defendants chose to seek summary judgment on Gessner's excessive force claim in favor of all Defendant Officers except Officer Cope.  At present, then, Officer Cope faces trial on Gessner's Fourth Amendment excessive force claim.  But

36

one thing has changed since Gessner's deposition.  In his Memorandum in Opposition to

Summary Judgment, he states:

> Immediately after speaking with Trupp and Cope, the Plaintiff realizes [sic] that Defendant Trupp is the Dayton Police Officer who violated the Plaintiff's 4th Amendment rights to be free from unreasonable and excessive force when he grabbed Plaintiff by his left arm and slammed him down on the ground face first, and then beat him in the back of his head with his bare knuckles.

(Doc. #34, PageID at 422-23).  Gessner explains that during his deposition, he inadvertently

switched Officer Cope's name with Officer Trupp's.  He further explains that he "knew only

the color of hair to describe the actions of Defendants Cope and Trupp.... [Gessner] thought

Cope was the Defendant with red hair and up until he personally met the 2 did he realize that

..." he had switched their names.  *Id*., PageID at 437.  He suggests, "[his] entire deposition

testimony ... needs to be switched in identification of these two Defendants Trupp and

Cope."  *Id*.  This creates a bit of a sticky wicket.

"[A] party cannot create a genuine issue of material fact by filing an affidavit, after a

motion for summary judgment has been made, that essentially contradicts his earlier

deposition testimony."  *Penny v. United Parcel Service*, 128 F.3d 408, 415 (6th Cir. 1997);

*see Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986).  This rule "is grounded

on the sound proposition that a party should not be able to create a disputed issue of material

fact where earlier testimony on that issue by the same party indicates that no such dispute

exists."  *Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 907 (6th Cir. 2006).  "A directly

contradictory affidavit should be stricken unless the party opposing summary judgment

provides a persuasive justification for the contradiction." *Id.*, 448 F.3d at 908.

Gessner's explanation of why he incorrectly named Officer Cope as the alleged wrongdoer during his deposition might seem sufficient, *see Aerel*, 448 F.3d at 907, to allow him to switch two names in his deposition testimony. By doing so he would identify Officer Trupp, not Officer Cope, as the alleged wrongdoer. Yet Defendants contend that Gessner may not change his deposition testimony because he has only submitted unsworn statements to contradict his sworn deposition testimony. Defendants further point out that Gessner has not amended his deposition testimony, and they argue that he has not submitted a sworn statement contradicting or explaining the contradiction in his deposition testimony. Defendants are correct.

Unlike the present case, the new evidence at issue in *Aerel* involved an affidavit submitted in support of the proposed post-deposition change. Gessner, however, has not submitted his affidavit or an unsworn declaration sufficient to substitute for an affidavit, *see* 28 U.S.C. §1746, or another piece of evidence mandated by Rule 56(c)(1) in support of his desire to identify Officer Trupp as the alleged wrongdoer. Consequently, he has not met his duty at the summary-judgment stage to produce affirmative evidence showing that a genuine issue of material fact exists as to whether Officer Trupp was the sole alleged wrongdoer who allegedly slammed and punched Gessner. Officer Trupp is therefore entitled to summary judgment.

Turning to Officers Howard, Dorsten, and Beavers, Gessner does not allege that they used any force, let alone unreasonable force, to effect his arrest in violation of his Fourth

38

Amendment rights.  Consequently, no reasonable jury could conclude that Officers Howard, Dorsten, or Beavers used any force, let alone unreasonable force, to effect Gessner's arrest in violation of the Fourth Amendment.

Gessner claims that these Officers violated his Fourth Amendment rights by failing to stop the constitutionally excessive force allegedly used to effect his arrest.

"'Generally speaking, a police officer who fails to act to prevent the use of excessive force may be held liable when (1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring.'"  *Smoak v. Hall*, 460 F.3d 768, 784 (6th Cir. 2006) (quoting *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997)).

Gessner testified in his deposition that only three or four seconds passed from the time Officer Cope jerked him to the ground and struck him twice.  (Doc. #26, PageID at 316).  Given this very quick action, no reasonable juror could conclude that Officers Howard, Dorsten, or Beavers had enough time or an opportunity to intervene to prevent the amount of force allegedly used to effect Gessner's arrest.  And considering the undisputed facts, no objectively reasonable officer in their position would know that their inaction – not physically participating in Gessner's arrest; not intervening in his four-second arrest – would violate his clearly established Fourth Amendment rights.  *See Turner*, 119 F.3d at 429-30.  As a result, Officers Howard, Dorsten, and Beavers are shielded by qualified immunity.

Accordingly, Officers Howard, Trupp, Dorsten, and Beavers are entitled to summary judgment on Gessner's Fourth Amendment excessive and unreasonable force claim.

### E.    __Municipal Liability__

Gessner claims that Defendant City of Dayton violated his rights under the Fourth and Fourteenth Amendments by (1) not providing more training and proper discipline of the Defendant Police Officers, (2) enabling constitutionally deficient arrest procedures and policies, (3) allowing Dayton Police Officers to use excessive force on him when placing him under arrest on several occasions in the past due to the City's failure to properly discipline Dayton Police Officers, and (4) having a policy or custom of encouraging or tolerating his detention or arrest without probable cause.  He alleges, "There is plenty of evidence in this case that shows an explicit policy used by ... the City of Dayton ... commanding its Police Officers to use excessive, unprovoked, unnecessary, and unreasonable force to effect the arrest of the Plaintiff, Mark Gessner at his home without a warrant and[/]or to arrest him without probable cause while he was present in public."  (Doc. #15, PageID at 96).

To succeed in supporting his §1983 claims against the City of Dayton, Gessner must show that the City maintains unconstitutional or illegal policies.  *Monell v. Dept. of Social Services*, 436 U.S. 658, 694, 98 S.Ct. 2018 (1978).  He must "identify the policy, connect the policy to the city itself, and show that the particular injury was incurred because of the execution of that policy."  *Searcy v. City of Dayton*, 38 F.3d 282, 287 (6th Cir. 1994).  In other words, he must establish "a close causal connection between the policy and the injury suffered."  *Johnson v. Hardin County, Ky.*, 908 F.2d 1280, 1285 (6th Cir. 1990).

"In order to prove the existence of a municipality's policy or custom, plaintiffs 'can

40

look to (1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations." *Mann v. Helmig*, 289 Fed. Appx. 845, 849 (6th Cir. 2008)(quoting *Thomas v. City of Chattanooga*, 398 F.23d 426, 429 (6th Cir. 2005)).

Gessner has not produced affirmative evidence indicating the existence of a City of Dayton policy, practice, or custom that did any of the following:  enabled or encouraged arrests without probable cause in violation of the Fourth Amendment; established constitutionally deficient arrest procedures; allowed Dayton Police Officers to use excessive force on him when placing him under arrest; failed to properly discipline Dayton Police Officers; or encouraged or tolerated his detention or arrest without probable cause.  He must do more in response to Defendants' Motion for Summary Judgment than contend that there is "plenty of evidence" of a policy, practice, or custom; he must point to the "particular parts of materials in the record..." to support this contention.  Fed. R. Civ. P. 56(c)(1)(A).  The District Court is under no duty to "search the entire record to establish that it is bereft of a genuine issue of material fact."  *Guarino v. Brookfield Twp. Trustees*, 980 F.2d 399, 404 (6th Cir. 1992) (quoting *Street,* 886 F.2d at 1479-80).

Gessner has likewise not presented affirmative evidence from which a jury could reasonably conclude that a City policy, practice, or custom caused a violation of his rights under the Fourth and Fourteenth Amendments.  "[I]t is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality.  The plaintiff must also

41

demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged. *Bd. of County Comm'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 404, 117 S. Ct. 1382 (1997)(italics in original); *see Graham ex rel. Estate of Graham v. County of Washtenaw*, 358 F.3d 377, 383 (6th Cir. 2004)(and cases cited therein). Gessner likewise presents no affirmative evidence of a causal connection between a City policy, practice, or custom and his arrests over the years by Dayton Police Officers. And without more additional supporting evidence, Gessner's dissatisfaction with the results of his several complaints to Internal Affairs fails to support his allegation that the City failed to properly discipline any Dayton Police Officer or that "a direct causal link" exists between such a failure and a violation of his Fourth Amendment rights on August 12, 2009.

In support of his claim of inadequate or improper police training, Gessner points to parts of Officer Howard's and Trupp's respective deposition testimony. (Doc. #34, PageID at 436). He also points to several deposition Exhibits including, for instance, reports from the Dayton Incident Based Reporting System. *Id*. And he relies on the events that occurred during his encounter with Defendant Officers on August 12, 2009. *Id*., PageID at 436-39. A review of these Exhibits and Gessner's review of the events does not reveal the presence of affirmative evidence upon which a jury could reasonably conclude that Defendant Officers, or Dayton Police Officers, did not receive adequate or proper training or that any training directly caused a violation of Gessner's Fourth Amendment rights on August 12, 2009. Gessner has also not shown evidence sufficient to create a genuine issue of fact over the affidavit of Dayton Police Chief Richard Biehl – upon which Defendants rely. Without

42

contrary affirmative evidence by Gessner, Chief Biehl's affidavit describes the extensive training and proper training Dayton Police Officers receive.  *See* Doc. #25, PageID at 149-151.

Accordingly, Defendant City of Dayton is entitled to summary judgment.

### F.     State Law Claims

Gessner claims that his arrest without probable cause constituted a false arrest under Ohio law and violated his rights under the Ohio Constitution.  He further claims that Defendants' actions constituted the tort of intentional infliction of emotional distress.

Defendants – including Defendant Cope – seek summary judgment in their favor on Gessner's state law claims.  They contend that the applicable one-year statute of limitations bars Gessner's state law claims.

Gessner was arrested on August 12, 2009.  He filed the present case on August 11, 2011.  Consequently, if a one-year statute of limitation applies to Gessner's claims under Ohio law, his claims are untimely.  This possibility requires relatively brief discussion.

Gessner's claim of false arrest is subject to the one-year statute of limitations set forth in Ohio Rev. Code §2305.11(A).  *Haag v. Vill. of Camden*, 23 Fed. Appx. 384, 385 (6th Cir. 2001); *see Huffer v. Bogen*, __ Fed. Appx. __, __, 2012 WL 5359637 (6th Cir. Nov. 1, 2012).

Gessner's claim of intentional infliction of emotional distress is subject to the same statutory one-year limit, albeit for different reasons.

The statute of limitations [in Ohio] which applies to the intentional

43

infliction of emotional distress can vary depending on the type of action which gives rise to the claim.  'Generally, the applicable statute of limitations for a claim of intentional infliction of emotional distress is four years.  However, when the acts underlying the claim would support another tort, the statute of limitations for that other tort governs the claim for intentional infliction of emotional distress.'

*Crist v. Pugin*, 3:08CV501, 2008 WL 2571229 at *3 (N.D. Ohio June 25, 2008) (Katz, D.J.) (quoting, in part, *Stafford v. Clever Investigations Corp.,* 2007 WL 2800333, *2 (Ohio Ct.App. Sept. 27, 2007)); *see Ruckman v. Riebel*, 2:11-CV-874, 2012 WL 4057409 at *4 (S.D. Ohio Sept. 14, 2012) (Smith, D.J.).  Gessner bases his claim of intentional infliction of emotional distress on the same factual allegations he raises in support of his false arrest claim.  Because of this, the four-year statute of limitations generally applicable to claims of intentional infliction of emotional distress does not apply to Gessner's intentional infliction claim.  Instead, the one-year statute of limitations applicable to his false arrest claim also applies to his claim of intentional infliction of emotional distress.  *See Crist*, 2008 WL 2571229 at *3; *see also Smith v. Montgomery County Sheriff's Office*, 3:10-CV-448, 2012 WL 4792398 (S.D. Ohio Oct. 9, 2012)(Merz, M.J.) (report and recommendation adopted sub nom. *Smith v. Montgomery County Sheriff's Office*, 3:10-CV-448, 2012 WL 6114757 (S.D. Ohio Dec. 10, 2012) (Rose, D.J.)); *Ruckman*, 2012 WL 4057409 at *4 (and cases cited therein).  His claim of intentional infliction of emotional distress is therefore time barred.

Lastly, Defendants are entitled to summary judgment on Gessner's claim that the lack of probable cause for his arrest violated his rights under the Ohio Constitution. "Ohio courts

44

have read Article I, Section 14 of the Ohio Constitution[7] 'to protect the same interests and in a manner consistent with the Fourth Amendment to the United States Constitution.'" *Logsdon v. Hains*, 492 F.3d 334, 347 (6th Cir. 2007)(footnote added) (quoting, in part, *State v. Andrews,* 57 Ohio St.3d 86, 565 N.E.2d 1271, 1273 n.1 (1991)).  Gessner's arrest was supported by probable cause in satisfaction of the Fourth Amendment.  *Supra*, § III(C)(3).  The existence of probable cause likewise satisfies the parallel requirement of the Ohio Constitution.  *Id.*

   Accordingly, Defendants are entitled to summary judgment on Gessner's state-law claims.

## IT IS THEREFORE RECOMMENDED THAT:

1.   Defendants' Motion for Summary Judgment (Doc. #25) be GRANTED; and

2.   Gessner's Fourth Amendment claims remain pending against Officer Cope.[8]


April 2, 2013

                              s/Sharon L. Ovington
                              Sharon L. Ovington
                    Chief United States Magistrate Judge

---

   [7]  Article I, §14 of the Ohio Constitution provides, in part:  "The right of the people to be secure in their persons, houses, papers, and possessions, against unreasonable searches and seizures shall not be violated ...."

   [8]  Officer Cope is not entitled to summary judgment on Gessner's Fourth Amendment *Terry*-stop and probable-cause claims even though the other Defendants are because Defendants did not seek summary judgment in favor of Officer Cope on Gessner's federal claims.

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations.  Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F).  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within fourteen days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140 (1985).